UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| STEVE ROGERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:19-cv-03722-TWP-MPB |
| ) | |
| WEXFORD OF INDIANA, LLC, PAUL A. ) | |
| TALBOT, M.D., and LAURA BODKIN, Previous ) | |
| Grievance Specialist, ) | |
| ) | |
| Defendants. ) | |

### ENTRY DENYING MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Wexford of Indiana, LLC, ("Wexford"), and Paul A. Talbot, M.D., ("Dr. Talbot") (collectively "the Medical Defendants")[1]. (Dkt. 98.) While a prisoner in the Indiana Department of Correction, Plaintiff Steve Rogers ("Rogers"), developed hernias, underwent surgery and suffered a great deal of pain. He initiated this action alleging the Medical Defendants were deliberately indifferent to his serious medical needs and deprived him of the level of medical care required by the Eighth Amendment to the United States Constitution. Because the evidence would allow a reasonable jury to find both of the Medical Defendants responsible for violations of Rogers' Eighth Amendment rights, their Motion is **denied**.

### I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that the movant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. Federal

---

[1] Mr. Rogers also asserts claims against a prison employee, Laura Bodkin, who handled grievances about his medical issues. Laura Bodkin has also filed a Motion for Summary Judgment. (Dkt. 102). The Court will address her Motion in a separate order.

Rule of Civil Procedure. 56(a).  A party must support any asserted disputed or undisputed fact by citing to specific portions of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party may also support a fact by showing that the materials cited by an adverse party do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the only disputed facts that matter are material ones—those that might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016).  "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609−10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 717 (7th Cir. 2018).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  The court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3).

## II. FACTUAL BACKGROUND

The following facts are drawn from the undisputed evidence or, where disputed, are set forth in the light most favorable to Rogers, the non-moving party.

Rogers is a 72 year old prisoner in the Indiana Department of Correction who suffered a medical injury in the form of a hernia in approximately 2017. (Dkt. 118 at 1). Defendant Wexford contracted to provide medical care to Indiana Department of Correction inmates during the time Mr. Rogers dealt with his hernias, and Dr. Talbot was Mr. Rogers' physician in 2019.

### A.  First Hernia and Treatment at Wabash Valley Correctional Facility ("Wabash")

It is not clear when Rogers was first diagnosed with a hernia. The earliest medical appointment documented in the record took place January 14, 2019, when he arrived at Pendleton Correctional Facility ("Pendleton") from Wabash Valley Correctional Facility ("Wabash"). (Dkt. 100-2 at 1.)

It is clear, however, that Rogers had an inguinal hernia near his right groin by April 2018, while he was still at Wabash. "An inguinal hernia occurs when tissue, such as part of the intestine, protrudes through a weak spot in the abdominal muscles."[2] Rogers was already managing hepatitis C, chronic liver disease, and cirrhosis. (Dkt. 100-2 at 8.) He had a hernia surgically repaired once in the past. *Id.* at 14. He notified the medical staff of his 2018 hernia through an April 23, 2018 Request for Health Care, stating, "I would like to know the reason I can't have the hernia I have fixed, taken care of?" (Dkt. 119 at 8.)

---

[2] Mayo Clinic, *Inguinal hernia*, https://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/syc-20351547 (last visited July 9, 2021); *see also Rowe v. Gibson*, 798 F.3d 622, 628 (7th Cir. 2015) (Courts may refer to "medical information [that] can be gleaned from the websites of highly reputable medical centers" in summary judgment rulings, even if it has not been presented by the parties.).

The record indicates vaguely that Wexford's regional director discussed Rogers' hernia with a surgeon in May 2018, but the surgeon was not willing to operate. (Dkt. 100-2 at 15.) The Medical Defendants have not filed medical records documenting the basis for the surgeon's refusal.

Rogers submitted more Requests for Health Care in the summer of 2018. On August 15, 2018, he wrote, "I want to . . . [t]alk to you about this hernia which is causing me more pain from what I have already. I would like to have it checked by a doctor that speciali[zes] in this area." (Dkt. 119 at 9.) On September 6, 2018, he reported that his hernia belt provided no relief. *Id.* at 10. Rogers later clarified that the hernia belt "just fit around [his] stomach" and provided no support for his hernia, which was near his right groin. (Dkt. 100-3 at 8 (Rogers Dep. 27:22–28:9).)

**B.    Move to Pendleton and Emergence of Second Hernia**

On December 25, 2018, while still at Wabash, Rogers submitted a Request for Health Care stating that his hernia was at least eight months old and "getting worse." (Dkt. 119 at 10.) "It is down in my testicle sac," he wrote, "causing a lot of discomfort, and more pain than I already have". *Id.*

Shortly thereafter, Rogers was moved to Pendleton. Hernias do not improve without treatment,[3] but the Pendleton staff did not even recognize Rogers' hernia during his appointments there. His medical intake papers do not refer to his hernia at all. (Dkt. 100-2 at 1–6.) Inexplicably, Dr. Talbot recorded on January 19, 2019 that Rogers *did not have* a hernia. *Id.* at 9 ("No hernia.").

Over the next three weeks, Rogers continued to report that his hernia was "causing more problems" than his hepatitis and liver disease. (Dkt. 119 at 10.) Moreover, he now had a "knot" in his stomach. *Id.* at 11. A nurse examined Rogers on February 15, 2019 and recognized the

---

[3] Mayo Clinic, *Inguinal hernia*, https://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/syc-20351547 ("An inguinal hernia . . . doesn't improve on its own . . . .").

4

"knot" as a large, umbilical hernia. (Dkt. 100-2 at 12–13.) "An umbilical hernia occurs when part of your intestine bulges through the opening in your abdominal muscles near your bellybutton (navel)."[4] "Umbilical hernias are common and typically harmless," although "[u]mbilical hernias that appear during adulthood are more likely to need surgical repair."

Dr. Talbot examined Rogers on February 20, 2019. (Dkt. 100-2 at 15–18.) For the first time, Dr. Talbot acknowledged Rogers' inguinal hernia. Dr. Talbot described the inguinal hernia as "extending the length of the right inguinal canal" with a "golf-ball sized mass in [his] scrotum." *Id.* at 17. He noted that the hernia was tender and that Rogers could reduce the hernia (that is, push it back into the abdominal cavity) only while lying down and only with pain. *Id.*

Dr. Talbot also observed a baseball-sized mass near Rogers' navel, but he found it more likely to be a lipoma than an umbilical hernia. *Id.* at 16–17. "A lipoma is a round or oval-shaped lump of tissue that grows just beneath the skin. . . . Lipomas are benign soft tissue tumors. They grow slowly and are not cancerous."[5]

Following the February 20, 2019 appointment, Dr. Talbot ordered a hernia belt but no treatment for Rogers' inguinal hernia. (Dkt. 100-2 at 18.) Dr. Talbot noted that a surgeon expressed unwillingness to operate on Rogers' inguinal hernia in May 2018.[6] *Id.* at 15. Dr. Talbot states now that he "submitted a request for" a liver ultrasound after the February 20, 2019

---

[4] Mayo Clinic, *Umbilical hernia*, https://www.mayoclinic.org/diseases-conditions/umbilical-hernia/symptoms-causes/syc-20378685 (last visited July 29, 2021).

[5] Cleveland Clinic, *Lipoma*, https://my.clevelandclinic.org/health/diseases/15008-lipomas (last visited July 22, 2021).

[6] Dr. Talbot states now that the surgeon refused to operate in 2018 because Rogers' liver conditions complicated any surgery, (*see* Dkt. 100-1 at ¶ 8), but no documents from the 2018 referral appear in the record. Dr. Talbot's after-the-fact explanation is inadmissible, and the Court disregards it. No evidence supports a finding that Dr. Talbot personally knows why the surgeon was unwilling to operate on Mr. Rogers in 2018. Fed. R. Evid. 602. And even if it is fair to infer that Dr. Talbot learned the surgeon's rationale by reviewing Rogers' medical records, he offers a hearsay description of treatment notes that he easily could have entered into the record. *See* Fed. R. Evid. 802 (hearsay), 805 (hearsay within hearsay), 1002 (requirement that a document be introduced to prove its own contents).

appointment, (Dkt. 100-1 at ¶ 8), implying that an ultrasound might show changes in Rogers' condition that would make surgery appropriate. Dr. Talbot's February 20, 2019 treatment notes do not indicate, however, that he actually ordered an ultrasound or that he reconsidered surgical referral. *Compare* Dkt. 100-2 at 15 (noting that Rogers was "due for" a 6–12 month ultrasound) *to* Dkt. 100-2 at 17–18 (documenting that Dr. Talbot ordered a hernia belt and certain medications but silent as to ultrasound).

Over the next seven weeks, Rogers did not see a doctor, but he submitted three Requests for Health Care. He reiterated that his hernias were causing "constant pain," limiting his mobility, and preventing him from "liv[ing] a normal life." (Dkt. 119 at 11.) When a nurse examined Rogers on March 15, 2019, his "[e]ntire abdomen" was tender, and touching it made him "wince." *Id.*; Dkt. 100-2 at 20. On April 3, 2019, a nurse described Rogers as having a "large umbilical hernia"—not a lipoma—and observed that his inguinal hernia was now the size of a baseball. (Dkt. 100-2 at 22.)

When Dr. Talbot examined Rogers on April 12, 2019, he acknowledged "2 very large hernias." (Dkt. 100-2 at 25.) Both were tender, and Rogers could no longer reduce either one. *Id.* Finally, Dr. Talbot requested that Rogers be examined by a surgeon. *Id.*

Dr. Duan Pierce ("Dr. Pierce"), another general physician, examined Rogers two weeks later to provide a second opinion. *Id.* at 31–36; Dkt. 100-1 at ¶ 12. By then, the umbilical hernia was "[g]rapefruit sized." (Dkt. 100-2 at 36.) Dr. Pierce noted that the hernias affected Rogers' ability to walk, determined that surgery was appropriate, and projected that surgery would improve his quality of life. *Id.* at 34–35.

It is not clear when the Wexford staff actually arranged for Rogers to meet with a surgeon. Dr. Talbot noted on May 10, 2019, that surgery was "approved," but records from that visit provide

6

no details about whether surgery had been approved by all necessary Wexford officials or scheduled with an outpatient facility. *Id.* at 37–39. On June 6, 2019, Dr. Talbot noted that a surgeon "recently" examined Rogers and recommended surgery. *Id.* at 41.

### C. Surgery and Recovery

The medical staff eventually scheduled Rogers' surgery for June 25, 2019, but no one told him. Because he was unaware of the surgery, Rogers did not fast. He ate before he was taken to the hospital, so his surgery was postponed. *Id.* at 46; Dkt. 100-3 at 11 (Rogers Dep. 39:9–23). Thirteen days later, Rogers underwent successful surgery. (Dkt. 100-2 at 48–52.)

Rogers appears to have recovered well from his hernia operation. In the month after his surgery, Rogers reported difficulties in receiving his medications in the infirmary, plus one episode of pain and bruising near his surgical sites. (*See* Dkt. 100-2 at 55–58; Dkt. 119 at 13.) However, these issues appear to have been isolated and quickly resolved. Rogers submitted no healthcare requests regarding his hernias from July 23, 2019 until February 2020. Examination notes from August 2019 describe no issues related to the hernias, and Dr. Talbot described the surgical sites as "stable" in November 2019. (Dkt. 100-2 at 61–68.)

### D. Surgical Mesh Rupture and Return of Hernias

On February 4, 2020, Rogers submitted a healthcare request reporting that his hernias had returned and he was in pain. (Dkt. 119 at 14.) A week later, a nurse observed a reducible hernia and gave Rogers an abdominal binder. *Id.* at 19–20. Dr. Pierce examined Rogers on February 27, 2020, but did not address the hernia. (Dkt. 47-2 at 23–25.)

In March 2020, the Court granted a preliminary injunction directing Wexford to arrange an appointment with a surgeon and then follow the surgeon's recommendations. (Dkts. 53, 54.) On June 25, 2020, Rogers notified the Court that a surgeon examined him, determined that the

mesh used to repair his hernias had ruptured, and recommended a second surgery.  (Dkt. 66.)  He had surgery in July 2020.  (Dkt. 119 at 14.)

### III.  ANALYSIS

Rogers asserts that Dr. Talbot and Wexford deprived him of the level of medical care required by the Eighth Amendment. "Prison officials violate the [Eighth Amendment's] prohibition on cruel and unusual punishment if they act with deliberate indifference to a prisoner's serious medical condition." *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  "A medical condition is serious if it 'has been diagnosed by a physician as mandating treatment' or 'is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). "As its name implies, deliberate indifference requires 'more than negligence and approaches intentional wrongdoing.'" *Goodloe v. Sood*, 947 F.3d 1030 (7th Cir. 2020) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)). "[T]he evidence must show that the prison official . . . knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Id.*

As "a private corporation that has contracted to provide essential government services," Wexford "is subject to at least the same rules that apply to public entities." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017).  This means "the *Monell* theory of municipal liability applies" to Rogers' Eighth Amendment claims against Wexford. *Whiting v. Wexford Health Sources*, 839 F.3d 658, 664 (7th Cir. 2016) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).  "The critical question under *Monell* . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson*, 849 F.3d at 379.

8

Wexford was responsible for Rogers' medical care from the time his first hernia appeared in 2018 until his hernias were repaired again in 2020. Dr. Talbot was responsible for and involved in Rogers' care only from Rogers' arrival at Pendleton in January 2019 until Dr. Talbot's departure in late 2019. The Court therefore proceeds through the Eighth Amendment analysis in three phases. First, could a reasonable jury find that Rogers suffered an Eighth Amendment injury? If so, could a reasonable jury attribute responsibility for Rogers' Eighth Amendment injury to Dr. Talbot and Wexford, respectively?

**A.     Did Rogers suffer an Eighth Amendment injury?**

Rogers' claims encompass two rounds of hernia flare-ups. With respect to each round, the Court must determine whether evidence permits the conclusions that his hernias presented an objectively serious medical condition and that the prison medical staff was deliberately indifferent to his condition.

**1.     Original Hernias—2018 and 2019**

Wexford's regional director considered Rogers' first hernia a serious medical condition, potentially requiring surgery, by May 2018. (Dkt. 100-2 at 15.) Although the surgeon declined to operate, Rogers described his inguinal hernia throughout 2018 and 2019 as causing more pain than his hepatitis and liver conditions. (*See* Dkt. 119 at 9–11.) By the winter of 2019, he had a second hernia and reported that the hernias were interfering with his mobility and other activities. *Id.* at 11; Dkt. 100-2 at 34–35. Thus, there is no question that Rogers was suffering from a serious medical condition. *See Perry*, 990 F.3d at 511.

"The real issue, then, is whether" the medical staff "intentionally or with deliberate indifference ignored" Rogers' hernias. *Ortiz v. Webster*, 655 F.3d 731, 735 (7th Cir. 2011). "Demonstrating that the inmate received *some* treatment does not automatically defeat a claim of

9

deliberate indifference." *Peterson v. Wexford Health Sources*, 986 F.3d 746, 752 (7th Cir. 2021) (internal quotations omitted). Still, deliberate indifference "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources*, 982 F.3d 451, 458 (7th Cir. 2021) (internal quotations omitted). One "type of evidence that can support an inference of deliberate indifference is an inexplicable delay in treatment which serves no penological interest." *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016).

The record documents that Rogers began complaining of a hernia in April 2018. (Dkt. 119 at 8.) Over the next eight months, he complained of progressively increasing pain and reported that the hernia extended into his scrotum. *Id.* at 9–10. Despite urging the Court to "look at the totality of [Rogers'] medical care," (Dkt. 120 at 10), the Medical Defendants present no evidence that he received any care whatsoever during those eight months. The record reflects only that Rogers was considered for surgical referral, (Dkt. 100-2 at 15), rejected, and left to make do with a hernia belt that was not even designed to support his hernia, (Dkt. 100-3 at 8 (Rogers Dep. 27:22–28:9).) A jury could reasonably infer from this evidence that Rogers had a serious medical need in 2018 and faced total unconcern or inexplicable delay in response. *Donald*, 982 F.3d at 458; *Petties*, 836 F.3d at 730.

Rogers' care did not improve immediately or significantly when he moved to Pendleton in 2019. His medical records and Requests for Health Care documented a painful hernia that once prompted consideration for surgery and now extended into his scrotum. But his intake papers did not address his hernia, and Dr. Talbot incorrectly documented that he *did not have* a hernia in January. (Dkt. 100-2 at 1–6, 9.) In February 2019, Dr. Talbot identified a golf ball-sized hernia in Rogers' scrotum that he could not easily reduce, and he misdiagnosed the baseball-sized umbilical hernia—which he could not detect a month earlier—as a slow-growing lipoma. *Id.* at

15–18.  He ordered a hernia belt but provided no treatment for the inguinal hernia.  *Id*.  Finally, Dr. Talbot referred Rogers for surgical consultation on April 12, 2019, after Rogers complained for months that his hernias limited his mobility and activities and his inguinal hernia grew to the size of a baseball.  (Dkt. 100-2 at 22; Dkt. 119 at 11.)  A jury could reasonably find that Dr. Talbot oscillated between total unconcern and inexplicable delay.

Nearly three months passed before Rogers finally received his surgery.  First, he had to meet with Dr. Pierce, who described Rogers' umbilical hernia as grapefruit-sized and found his ability to walk limited by the hernias.  (Dkt. 100-2 at 31–36.)  His surgery still was not scheduled for another two months, and then it was delayed another two weeks because no one informed Rogers that his surgery was scheduled and he could not eat beforehand.  *Id.* at 46, 48–52; Dkt. 100-3 at 11 (Rogers Dep. 39:9–23).

The size of Rogers' hernias by Spring 2019 would make their seriousness obvious to even a lay person, and they caused well-documented limitations.  A reasonable trier of fact could determine that the Wexford staff failed to schedule his surgery promptly either intentionally, inexplicably, or due to total unconcern.  The fact that Rogers' hernia surgery was rescheduled on two weeks' notice casts serious doubt on any notion that the two-month period between Dr. Talbot's referral and the original surgery date was a product of deliberative medical judgment.

    **2.**     **Recurrent Hernias—2020**

When Rogers' surgically repaired hernias ruptured in early 2020, his treatment followed a similar pattern.  Rogers complained that his hernias were causing pain in February 2020, and a nurse promptly identified a reducible hernia and provided an abdominal binder.  (Dkt. 119 at 14, 19–20.)  The first time a doctor examined Rogers, though, he did not address the hernia.  (Dkt. 47-2 at 23–25.)  In March 2020, the Court enjoined Wexford to arrange an appointment for Rogers

with a surgeon. (Dkts. 53, 54.) Months passed before that examination took place, and he did not actually receive surgery until July 2020. (Dkt. 66; Dkt. 119 at 14.) A reasonable trier of fact could again conclude that the treatment Wexford provided in 2020 was marked by some combination of total unconcern and inexplicable delay.

**B.** **Was Dr. Talbot responsible for Rogers' Eighth Amendment injury?**

Dr. Talbot's role in Rogers' hernia care is well-chronicled above. A jury could reasonably find that Dr. Talbot was deliberately indifferent to Rogers' need for hernia treatment and responsible for the constitutionally inadequate care he received.

At the beginning of their relationship, Dr. Talbot incorrectly documented that Rogers did not have a hernia—even though Rogers had recently complained of serious pain and limitations from a hernia and even though his records would have shown that he was considered for hernia surgery less than a year before. (Dkt. 100-2 at 9, 15.) According to Dr. Talbot's records, Rogers had a golf-ball-sized inguinal hernia in February that did not exist in January 2019. *Id.* at 15–18. Despite its rapid growth, he did not treat it for another two months, at which point it was baseball-sized. (Dkt. 100-2 at 22.) These facts preclude summary judgment for Dr. Talbot.

**C.** **Was Wexford responsible for Rogers' Eighth Amendment injury?**

With plenty of evidence suggesting that Rogers suffered an Eighth Amendment injury, the Court next considers whether a jury could reasonably attribute responsibility for that injury to Wexford under the *Monell* doctrine. The record supports two separate paths to *Monell* liability, and the Medical Defendants have not addressed either.

First, a plaintiff may prove a *Monell* claim by showing that his constitutional injury arose from a custom or practice of the defendant entity, even if that custom or practice "'has not received formal approval through the body's official decisionmaking channels.'" *Glisson*, 849 F.3d at 379

12

(quoting *Monell*, 436 U.S. at 690–691). Rogers attests that he personally knows two other inmates whose hernias have gone untreated for years and have been "forced to file" lawsuits to obtain adequate medical care. (Dkt. 119 at 24.) He identifies these inmates by name and their lawsuits in this Court by case number. The Medical Defendants have not responded to these allegations, so the Court treats them as true for purposes of summary judgment. *See* Fed. R. Civ. P. 56(e)(2); S.D. Ind. L.R. 56(f)(2).

Rogers' first hernia worsened for eight months before he arrived at Pendleton. There, his hernias grew for two more months before a doctor even acknowledged them. After two doctors determined surgery was appropriate, two more months passed before surgery was actually scheduled. These facts raise the question whether the indifference he experienced arose from a Wexford policy or practice. He has supplemented those facts by "show[ing] more than the deficiencies specific to his own experience." *Daniel v. Cook Cty.*, 833 F.3d 728, 734 (7th Cir. 2016). Rogers has provided evidence that would allow a jury to find that a Wexford custom or practice caused the medical staff to treat his hernias with deliberate indifference.

Second, "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990). In *Glisson*, the Seventh Circuit held that providing medical care to prisoners with chronic, complex illnesses is one such situation. *See Glisson*, 849 F.3d at 381 (citing *Sims*, 902 F.2d at 543). "One does not need to be an expert to know that complex, chronic illness requires comprehensive and coordinated care." *Id.* at 382. A prison medical provider can be liable under the Eighth Amendment for making "a deliberate policy choice pursuant to which no one was responsible for coordinating " the overall care of such patients. *Id.* at 375–76.

Rogers suffered not only from hernias, but also from hepatitis C, chronic liver disease, and cirrhosis. The record documents numerous examinations in which medical personnel addressed those serious conditions but gave his hernias little or no attention. *See* Dkt. 100-2 at 1–6 (no reference to hernias), 9 (incorrectly documenting "no hernia"), 37–39 (no reference to hernias). These records are evidence from which a jury could infer that Wexford declined to implement policies to ensure that inmates with multiple, diverse medical needs would receive necessary care for all their conditions. Wexford is not entitled to summary judgment.

### IV. CONCLUSION

The Medical Defendants' Motion for Summary Judgment, (Dkt. [98]), is **DENIED**. Rogers' claims against the Medical Defendants will be resolved by settlement or trial.

**SO ORDERED.**

Date:  7/30/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Steve Rogers, #875983
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Rachel D. Johnson
KATZ KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com

David C. Dickmeyer
INDIANA ATTORNEY GENERAL'S OFFICE
david.dickmeyer@atg.in.gov

Margo Tucker
INDIANA ATTORNEY GENERAL'S OFFICE
margo.tucker@atg.in.gov